# IN THE UNITED STATES DISTRICT COURT OF THE
# EASTERN DISTRICT OF OKLAHOMA

HOLLY LYNCH and DAVID RAY    )
LYNCH, as next of kin to DAVID CODY    )
LYNCH, deceased, and as Co-Special    )
Administrators of the ESTATE OF    )
DAVID CODY LYNCH,    )
    )
        Plaintiffs,    )
    )
vs.    )   Case No. CIV-16-247-JHP
    )
BOARD OF COUNTY COMMISSIONERS    )
OF MUSKOGEE COUNTY, OKLAHOMA,    )
ex rel. MUSKOGEE COUNTY SHERIFF'S    )
DEPARTMENT, et al.,    )
    )
        Defendants.    )

## OPINION AND ORDER

Now before the Court are the Motions for Summary Judgment of Defendant Jerome Wildcat [Dkt. # 70] and Defendant Jack Denny [Dkt. # 72]. Plaintiffs, Holly Lynch and David Ray Lynch, as next of kin to David Cody Lynch, deceased, and co-Special Administrators of the Estate of David Cody Lynch, brought this action pursuant to 42 U.S.C. § 1983 alleging the conduct of Defendants violated Cody Lynch's rights under the United States Constitution and Oklahoma law. Specifically, Plaintiffs allege Defendants' use of force against Cody Lynch was excessive and violated his rights under the Fourth and Fourteenth Amendments. Plaintiffs have also asserted violations of Cody Lynch's rights under the Oklahoma Constitution, Government Tort Claims Act, and common law. In their Motions for Summary Judgment, Defendants contend they are entitled to judgment on all claims that Plaintiffs have asserted against them. After consideration of the pleadings, affidavits, and briefs, the Court finds the Motion for

Summary Judgment of Defendant Jerome Wildcat and the Motion for Summary Judgment of Defendant Jack Denny should be GRANTED.

## BACKGROUND

### A. PROCEDURAL HISTORY

Plaintiffs commenced this action on May 16, 2016, in the District Court of Muskogee County. In their Petition, Plaintiffs named as defendants the Board of County Commissioners of Muskogee County *ex rel.* Muskogee County Sheriff's Department; Deputy Derek Apple of the Muskogee County Sheriff's Department; the Town of Warner *ex rel.* Warner Police Department; Officer Michael Shamblin of the Warner Police Department; the Town of Porum *ex rel.* Porum Police Department; and Officers Jerome Wildcat and Jack Denny of the Porum Police Department. Defendants jointly removed Plaintiffs' Petition to this Court on June 9, 2016. [Dkt. # 3]. On April 7, 2017, Defendants Jerome Wildcat and Jack Denny filed their respective Motions for Summary Judgment. [Dkt. # 70]; [Dkt. # 72]. Plaintiffs filed their Response in Opposition to Wildcat's Motion for Summary Judgment [Dkt. # 158] and Response in Opposition to Denny's Motion for Summary Judgment [Dkt. # 156] on October 26, 2017. Defendants Wildcat and Denny jointly filed a Reply to Plaintiffs' Response on December 5, 2017. [Dkt. # 201]. Finally, Plaintiffs filed a Sur-Reply to Defendants' Reply on January 3, 2018. [Dkt. # 206].

### B. FACTUAL BACKGROUND

On April 3, 2015, David Cody Lynch ("Decedent" or "Cody Lynch") and his wife, Holly Lynch, attended a cookout at Holly's mother's house. Marshall Lynch (Decedent's brother), Alyssa Hafenbrack (Marshall's girlfriend), and their friend, Price Rogers, also attended the cookout. While at the cookout, Cody Lynch consumed alcohol and became intoxicated. It was

later confirmed by his autopsy report that he was also under the influence of a significant amount of methamphetamine at the time of the subject incident. After the cookout, Decedent and his brother, Marshall, were doing "burnouts" and "donuts" in their trucks on a nearby highway. At some point, Decedent lost control of his truck, went across the ditch, crashed through a fence, and got the truck stuck in a wire fence. Someone called the police to report this activity.

At approximately 11:35 p.m., Warner Police Officer Michael Shamblin responded to a call of a vehicle accident north of Warner, at State Hwy. 64 and E. 158 St., South in Muskogee County, Oklahoma. Officer Shamblin arrived on the scene around 11:40 p.m. and saw two parked trucks. He spoke briefly to the two individual drivers and advised dispatch that Oklahoma Highway Patrol was not needed, but requested a deputy because one of the drivers, later identified as Cody Lynch, the Decedent, appeared to be intoxicated. Officer Shamblin asked Lynch numerous times to get out of the road and to step to the back of his vehicle where it was safe. Lynch eventually complied and, as Officer Shamblin was questioning him, he began to mumble incoherently. When Officer Shamblin leaned closer to Lynch in order to hear him, Lynch punched him in the face. A struggle ensued, and Lynch hit Officer Shamblin in the face at least two more times until the officer took him to the ground. The two rolled around on the ground struggling, and Officer Shamblin eventually got on top of Lynch, straddled his back, and tried to control Lynch's hands.

The two ended up in a ditch – their heads were positioned up hill and their knees and feet were in the ditch. The two were wet and muddy, and the officer had a hard time maintaining a hold on Lynch because he was slick. Officer Shamblin soon became aware of several people present at the scene of the struggle because he could see their feet above him. Lynch repeatedly yelled for them to attack Officer Shamblin, who felt that he was beginning to lose control over

Lynch. As a result, he told Lynch that if he did not comply with his directives, he was going to deploy his taser. Lynch, however, continued to threaten and struggle with Officer Shamblin, so the officer tased him for one or two seconds. Lynch continued to struggle nonetheless. Officer Shamblin threw the taser off to the left, was finally able to get on top of Lynch, and control one of his hands. While he was able to get one hand cuffed, Officer Shamblin could not get the other cuffed one because Lynch was lying on his stomach and his other hand was under his body. By this point, Officer Shamblin was exhausted. Officer Shamblin told the bystanders that he needed them to call 911 immediately, or he was going to have to shoot Lynch. Alyssa Hafenbrack called 911 and held the phone down for Officer Shamblin to speak into it.

Around the same time, Marshall Lynch had called Decedent's wife, Holly Lynch, and told her that Decedent had been pulled over and was not cooperating with the police. Marshall asked her to come to the scene to calm Decedent down. She arrived at the scene about four minutes later. Marshall also called Decedent's father, Plaintiff, David Ray Lynch, who was at home at the time. Marshall advised Plaintiff of Cody Lynch's encounter with Officer Shamblin, and requested that he come to the scene of the incident. David Lynch and his friend, Ruby Lindsey, immediately went to the scene. It took them only a matter of minutes to get there. David Lynch approached Cody Lynch and Officer Shamblin, who were still struggling, put his knee on Cody's back, slapped him in the face, and said, "Boy, give him your damn hand." With David Lynch's assistance, Officer Shamblin was finally able to get both hands cuffed. Throughout these events, Cody Lynch continued to physically struggle with Officer Shamblin's attempts to restrain him. Cody Lynch also continued to ask for the bystanders to help him with his struggle against the officer.

When Officer Shamblin spoke to the dispatcher on Hafenbrack's phone, he advised that he needed help and requested back up immediately. At approximately 11:50 p.m., Muskogee County Sheriff's Deputy Derek Apple, after responding to the original call, was notified by dispatch that Officer Shamblin requested that he hurry because he needed immediate help. Deputy Apple arrived at the scene close to 11:58 p.m. Deputy Apple saw that Officer Shamblin's duty belt had been broken during his struggle with Decedent and his radio, extra magazine, and taser were scattered and missing. Upon arrival, Deputy Apple searched for Officer Shamblin's missing equipment, which took several minutes. Officers Jack Denny and Jerome Wildcat of the Porum Police Department responded to dispatch at approximately 11:54 p.m. and arrived at the scene around 11:58 p.m. Officers Denny and Wildcat then relieved an exhausted Officer Shamblin in attempting to maintain control of Lynch, who continued to struggle against their attempts. Officer Denny observed that Officer Shamblin was covered in mud and his eyes were almost completely swollen shut. It was later determined that Cody Lynch had fractured Officer Shamblin's left orbital eye socket.

The Porum Police Department has written policies in place directing its officers to "use only the minimum necessary force to affect an arrest and take a person into custody." At the time of the incident, Officers Denny and Wildcat of the Town of Porum Police Department were both CLEET certified law enforcement officers with extensive training in the use of force. In fact, there is no evidence in the record of any prior pattern of similar incidents involving Defendants Denny or Wildcat or any other officer of the Porum Police Department. Based on their training and prior experience, Officer Denny placed one knee on Lynch's lower back and the other knee on the top of his shoulders while Officer Wildcat straddled Lynch's lower legs. Decedent continued to struggle, and Officer Denny repeatedly told him to stop fighting. While Officers

Denny and Wildcat attempted to subdue Lynch, Officer Shamblin and Deputy Apple retrieved some additional restraints for transporting Lynch. The handcuffs placed on Lynch were to be attached to the waist belt, which would then attach to the chain between Lynch's ankles and hands. Lynch continued to be combative, yelling, cursing, and biting at Officer Denny's legs. There were two occasions when Officer Wildcat believed Lynch was grabbing for the firearm in his drop holster.

As the officers were finishing the security of the additional restraints, Decedent abruptly became unconscious. He had continued to struggle against the restraints and been quite vocal up to the time he fell silent. Decedent had stopped breathing and the officers could not get a pulse. The officers quickly began CPR on Decedent. Ruby Lindsey, who had CPR training, believed the officers were not performing CPR correctly, and requested that the officers remove the handcuffs and lay Decedent flat on his back. They did so, and she again began to perform CPR on Decedent with the assistance of the officers. Alyssa Hafenbrack, who was in nursing school, also assisted in trying to resuscitate Decedent. Muskogee County Sheriff's Deputy Robert Jackson, who had arrived at the scene around 12:06 a.m., notified dispatch to alert EMS at 12:07 a.m. after he heard someone say, "He's not breathing." Officer Shamblin and Hafenbrack continued to perform CPR on Decedent until EMS arrived. At approximately 12:14 a.m., EMS arrived and took over the scene. Decedent was then transported to the Eastar Hospital. Decedent was pronounced dead at the hospital at 1:07 a.m.

In the Medical Examiner's Report, Dr. Cheryl Niblo concluded that Decedent's cause of death was "asphyxia due to physical restraint." Dr. Niblo, however, stated under oath that she cannot point to objectively observable physical conditions to support a conclusion on Decedent's cause of death. Specifically, Dr. Niblo testified to and found no evidence of petechiae (pinpoint

round spots) that are found in the vast majority of asphyxiation cases, visible bruising on Decedent's neck, muscle tears or cartilage damage to Decedent's neck, or any injury or trauma to Decedent's larynx, trachea, or pharynx. Moreover, Dr. Niblo found that Decedent's hyoid was intact, his airway unobstructed by dirt, grass or mud, and that his lungs were healthy and normal. Dr. Niblo further testified that the officers could not have known that Decedent had an enlarged heart or that he was under the influence of a significant amount of methamphetamine. Finally, Dr. Niblo testified that any pressure on Decedent's back or neck was not hard enough to cause damage to the trachea or larynx, rupture any ligaments, or break any bones. Any such pressure, she testified, would not be hard enough to do anything but produce a small hemorrhage that, in itself, did not produce Decedent's death. In fact, Dr. Niblo calls Decedent's death a "perfect storm," meaning that many factors converged to produce a highly unusual and unexpected result.

## **DISCUSSION**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986); *Anderson v. Liberty Lobby, In*c., 477 U.S. 242, 250 (1986); *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir. 1993). Fed. R. Civ. P. 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law." Id. at 251–252. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker*, 164 F.3d 1249, 1251 (10th Cir. 1998).

To survive summary judgment, a plaintiff "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case." *Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) (internal quotation marks omitted). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327.

## A. EXCESSIVE FORCE CLAIM UNDER 42 U.S.C. § 1983

Plaintiffs assert their claims against Defendants Wildcat and Denny under 42 U.S.C. § 1983. Specifically, Plaintiffs allege that Decedent's rights under the Fourth Amendment were violated by the alleged unlawful use of excessive force. Plaintiffs also assert a claim for the alleged violation of Decedent's right to substantive due process under the Fourteenth

Amendment. Substantive due process claims, however, when predicated upon an alleged violation of a more particularized constitutional right, must be analyzed in terms of the more specific right. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Accordingly, there is no need to address Plaintiffs' substantive due process claims apart from their excessive force claim. Therefore, the primary issue is whether the officers used excessive force against Decedent in violation of the Fourth Amendment. Here, the undisputed facts show the conduct of the officers, Defendants Wildcat and Denny, was not excessive force in violation of the Fourth Amendment.

Section 1983 creates no substantive civil rights, but rather only provides a procedural mechanism for enforcing rights established elsewhere. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Gallegos v. City and Cnty. of Denver*, 984 F. 2d 358, 362 (10th Cir. 1993). *See also Miller v. Hawver*, 474 F. Supp. 441, 442 n.1 (D. Colo. 1979) (§ 1983 is not a general or common law tort claims statute). To sustain a § 1983 claim, Plaintiffs must present "specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams*, 810 F. 2d 358, 363 (2nd Cir. 1987). Further, to establish liability under § 1983 against Defendants in their individual capacities, Plaintiffs must establish that the officers' actions were objectively unreasonable. *See Graham*, 490 U.S. at 393.

Thus, the actions of an officer must be analyzed under the Fourth Amendment's objective reasonableness standard in light of the particular circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "must embody the allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are often tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. *Id.* at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the

Fourth Amendment." *Id.* at 396. (citation and quotation marks omitted). The Tenth Circuit has repeatedly agreed with and affirmed the *Graham* court's reasoning on objective reasonableness. *See e.g., Fisher v. Las Cruces,* 584 F.3d 888, 895 (10th Cir. 2009) (quoting *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008)).

To determine whether a use of force employed was reasonable, courts must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interest at stake." Phillips v. James, 422 F.3d 1075, 1080 (10th Cir. 2005) (quoting *Graham*, 490 U.S. at 396). In balancing these interests, it is important to consider the following: (1) severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham,* 490 U.S. at 396. *See also Tennessee v. Garner,* 471 U.S. 1, 6 (1985). While it is important to consider these factors, the test ultimately rests on the question of "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." Garner, 471 U.S. at 8. *See also Summerland v. Cnty. of Livingston,* 240 Fed.Appx. 70, 76 (6th Cir. 2007) ("The ultimate question is 'whether the totality of the circumstances justified a particular search or seizure'") (quoting Garner, 471 U.S. at 8-9)); Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995) (holding objective reasonableness is based on the totality of the circumstances and the particular facts and circumstances of the case). "Thus, the excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007).

In the context of this particular case, many courts have found an officer putting his or her knees on the back of an arrestee to be objectively reasonable when the arrestee refuses to comply

with orders and resists officers' attempts to restrain him. *See e.g., Wells v. City of Dearborn Heights,* 538 Fed.Appx. 631, 637-38 (6th Cir. 2013) (an officer kneeing a detainee who had failed to respond to commands was objectively reasonable); *Goodrich v. Everett,* 193 Fed.Appx. 551, 557 (6th Cir. 2006) (finding that a knee in the back of a subject that "was capable of violence and inclined to flee" was reasonable under the circumstances."); *Mongeau v. Jacksonville Sheriff's Office,* 197 Fed.Appx. 847, 851 (11th Cir. 2006) (finding that an officer's placement of his knee in the back of the arrestee in order to subdue him was objectively reasonable given the arrestee's previous resistance and risk of flight); *Jackson v. City of Bremerton,* 268 F.3d 646 (9th Cir. 2001) (an officer placing his knee on an arrestee's back to in order to control a rapidly evolving and escalating situation was reasonable). It is important to further note that "[p]artially restrained or not, someone who is attempting to commit felony battery against law enforcement officials, and experiencing some success, could certainly be said to pose an immediate threat to the safety of the officers." *Estate of Escobedo v. Bender*, 600 F.3d 770 (7th Cir. 2010) (citing *Graham*, 490 U.S. at 397).

As a preliminary matter, Plaintiffs contend that Decedent was "hogtied," an illegal police tactic, and that the officers' continuous pressure on Decedent's back, shoulders, and neck caused him to die of asphyxia. There is insufficient evidence for either of Plaintiffs' contentions to survive summary judgment. First, the method for restraining Decedent was not a "hogtie." Under *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2011), a "hogtie" is defined as the "binding of the ankles to the wrist, behind the back, with 12 inches or less of separation." Here, the indisputable evidence shows the handcuffs placed on Decedent were attached to the waist belt, which was then attached to the chain between Decedent's ankles and hands. This method of attachment allows at least sixteen inches of space between the ankles and hands. There is

nothing in the video that contradicts the simple understanding of the officers' method of handcuffing Decedent. Therefore, there is no dispute of material fact as to whether Decedent was hogtied.

Second, Plaintiffs have presented insufficient evidence to support a claim that Decedent died of "positional asphyxiation," and Plaintiffs base this hypothesis for how Decedent died on the medical examiner's report prepared by Dr. Cheryl Niblo of the Office of the Chief Medical Examiner. Dr. Niblo, however, stated under oath that Decedent's death was a "perfect storm," meaning that many factors converged to produce a highly unusual and unexpected result. Dr. Niblo agreed the officers, including Defendants Wildcat and Denny, could not have predicted or foreseen the convergence of the factors that led to Decedent's unexpected death, which included Decedent's large heart and level of intoxication. Consequently, the unavoidable conclusion is that Defendants acted reasonably based on the information they had about Decedent at the time of the incident. Plaintiffs own expert has testified that Defendants could not have foreseen the "perfect storm" that resulted in Decedent's death. In these scenarios, it is imprudent to apply hindsight to what the officers specifically could have known at the time of the force. Therefore, there is no genuine dispute as to whether the pressure on Decedent's back, shoulders, and neck was excessive force.

Turning to the specific force in question, the evidence shows that Defendants Wildcat and Denny did not use force that was excessive in violation of the Fourth Amendment. Prior to the officers' arrival on the scene, Lynch and Officer Shamblin were engaged in a continuous struggle, where the officer was attempting to restrain Decedent, and Decedent was actively resisting those efforts. By the time Defendants Wildcat and Denny arrived, they encountered an officer in the midst of a protracted struggle, covered in mud, utterly exhausted, and pleading for

help. Defendants Wildcat and Denny immediately tried to help Officer Shamblin restrain Cody Lynch, so that Officer Shamblin could disengage. As they attempted to help Officer Shamblin, Decedent continued to squirm, fight, curse, toss, and turn. He attempted to bite Officer Denny's pants leg. He was erratically grabbing Officer Wildcat's drop leg holster. Decedent was not restrained, and represented a threat to Defendants Wildcat and Denny. Neither Officer Denny nor Officer Wildcat ever heard Lynch say that he "could not breathe" or that he was having a heart attack. Further, the undisputed evidence shows Decedent was talking and clearly breathing up until seconds before he became unconscious while the officers were installing the restraints. Ultimately, Decedent died as the result of an unusual "perfect storm" that Defendants could not have predicted.

The undisputed facts show neither officer acted in an objectively unreasonable manner. As to Officer Wildcat, Plaintiffs offer no evidence as to how he personally and directly participated in any use of force beyond straddling Decedent's legs for a few minutes. Straddling Decedent's legs is simply not enough to establish an excessive force claim against Defendant Wildcat. As to Officer Denny, there is similarly no evidence that he acted in an objectively unreasonable manner. It is undisputed that when the officers arrived on scene, they observed Officer Shamblin had been injured and that Decedent was combative and resistant. The officers repeatedly gave verbal commands to Decedent to stop resisting, but he refused to comply. Decedent's continuous actions, including both physical and verbal threats against the law enforcement officers, constituted an immediate threat to the safety of the officers. The situation was rapidly evolving, and the actions of Defendants Wildcat and Denny in placing using force against Decedent in order to restrain him were objectively reasonable.[1]

---

[1] Plaintiffs also include a section regarding a claim of failure to intervene. This cause of action is not included in their Complaint. As the statute of limitations has passed for Plaintiffs to assert this claim against Defendants Wildcat and Denny, this Court is reticent to consider the merits of

Thus, Plaintiffs have failed to establish any basis for holding Defendants Wildcat and Denny liable for any of David Cody Lynch's injuries. Specifically, Plaintiffs have presented insufficient evidence to raise a material dispute as to whether either officer used unconstitutionally excessive force in restraining Decedent. The actions of Defendants were objectively reasonable under the circumstances. There is nothing in the record to suggest otherwise. The Motions for Summary Judgment of Wildcat and Denny on Plaintiffs' § 1983 claims, therefore, are granted.

## B. PLAINTIFFS' STATE LAW TORT CLAIMS

### 1. Oklahoma Government Tort Claims Act

Plaintiffs have also asserted state law tort claims against Defendants Wildcat and Denny under the Oklahoma Government Tort Claims Act. Specifically, Plaintiffs allege that Defendants acted maliciously toward Decedent and outside the scope of their employment as officers for the Town of Porum Police Department. There is nothing in evidence indicating that either officer acted maliciously or outside the scope of his employment beyond mere conclusory speculation. Defendants Wildcat and Denny are entitled to summary judgment on Plaintiffs' state law tort claims.

The Oklahoma Governmental Tort Claims Act ("OGTCA") is the exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental entity for its torts and the torts of its employees. *Fuller v. Odom*, 1987 OK 64, 741 P.2d 449, 451-53; 51 O.S. § 153(B). The OGTCA adopts and reaffirms the sovereign immunity of the state, its political subdivisions, and all employees acting within the scope of their employment. 51 O.S. § 152.1(A). The state

---

their new claim. Plaintiffs, however, have failed to plead sufficient facts that would establish a claim that either officer acted excessively, thereby negating any claim regarding a "failure to intervene."

and its political subdivisions consent to suit only to the extent and in the manner provided in the Act. 51 O.S. § 152.1(B). *See also Salazar v. City of Oklahoma City*, 1999 OK 20, 976 P.2d 1056, 1065-66. Section 163(c) of the OGTCA states, in pertinent part: "Suits instituted pursuant to the provisions of this Act shall name as defendant the state or the political subdivision against which liability is sought to be established. In no instance shall an employee of the state or political subdivision acting within the scope of his employment be named as defendant[.]" 51 O.S. § 163. *See Carswell v. Oklahoma State Univ.*, 1999 OK 102, 995 P.2d 1118, 1123; *Parker v. City of Midwest City*, 1993 OK 29, 850 P.2d 1065, 1066, FN 1. *See also* 51 O.S. § 153(B) (stating the "liability of the state or political subdivision under this Act shall be exclusive and in place of all other liability of this state, a political subdivision **or** employee, at common law or otherwise").

Here, Plaintiffs submit that summary judgment is not appropriate because a jury "might" find that Defendants Wildcat and Denny acted maliciously and outside the scope of their employment. Plaintiffs have not submitted sufficient evidence to support this conclusion. Instead, Plaintiffs contend their claim should be presented to a jury for the simple reason that a jury could possibly view Defendants' conduct as being malicious and intentional. This Court disagrees. There must be more than a scintilla of evidence that Defendants acted intentionally and outside the scope of employment. Accordingly, Defendants Wildcat and Denny are immune from suit for Plaintiffs' state law tort claims under the OGTCA and are entitled to judgment as a matter of law.

### 2.  Intentional Infliction of Emotional Distress

Plaintiffs also assert a claim against Defendants Wildcat and Denny for the alleged intentional infliction of emotional distress upon them during the arrest of Decedent. As stated above, Defendants are immune from such a claim. Even if they were not immune, they are

entitled to summary judgment on the Intentional Infliction of Emotional Distress claim. The force used on Decedent was neither excessive nor intentionally tortious. As with Plaintiffs' claim under the OGTCA, there is insufficient evidence to create a material dispute that Defendants intentionally harmed Decedent thereby causing severe emotional distress to Plaintiffs. Moreover, Plaintiffs have not offered evidence that would establish their standing to pursue such a claim.

To recover damages for intentional infliction of emotional distress in Oklahoma, a plaintiff must demonstrate that: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Computer Pub., Inc. v. Welton*, 2002 OK 50, 49 P.3d 732, 735. The second element of the tort "requires proof that the defendant's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and that such conduct is regarded as atrocious and utterly intolerable in a civilized community." *Id.* (citation omitted). The fourth element of the tort "requires proof that the emotional distress suffered by the plaintiff was so severe that no reasonable [person] could be expected to endure it." *Id.* at 736 (citation and internal quotation marks omitted).

The Court acts as a gatekeeper to determine, in the first instance, whether there is sufficient evidence of extreme and outrageous conduct and sufficient evidence of severe emotional distress to warrant submitting the issue to a jury:

> The court, in the first instance, must determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery or whether it is necessarily so. Where, under the facts before the court, reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether the conduct in any given case has been significantly extreme and outrageous to result in liability. Likewise, it is for the court to determine, in the first instance, whether based upon the evidence presented, severe emotional

distress can be found. It is for the jury to determine whether, on the evidence, severe emotional distress in fact existed.

*Id*. at 735 (quoting *Breeden v. League Servs. Corp.*, 1978 OK 27, 575 P.2d 1374).

There is no evidence that Defendants Wildcat and Denny acted in such an extreme and outrageous manner with regard to Decedent as to support such a claim. Indeed, Plaintiffs simply have no evidence that Defendants used any excessive force against Decedent. Furthermore, there is no evidence that Plaintiffs have suffered severe emotional distress as a result of Defendants Wildcat and Denny's actions. Moreover, Plaintiffs cannot recover under a theory of intentional infliction of emotional distress because they were bystanders who suffered no physical injuries in the alleged incident.

Damages for mental anguish caused by witnessing the suffering of a third party may be compensable where the plaintiff also suffers physical injuries in the same accident which caused the third party's injuries. To support a cause of action for intentional infliction of emotional distress, it must be established that: 1) the plaintiff was directly physically involved in the incident; 2) the plaintiff was damaged from actually viewing the injury to another rather than from learning of the accident later; and 3) a familial or other close personal relationship existed between the plaintiff and the party whose injury gave rise to the plaintiff's mental anguish.

*Kraszewski v. Baptist Med. Ctr. of Oklahoma, Inc.*, 1996 OK 141, 916 P.2d 241, 250. There is also no evidence or allegation that Plaintiffs were directly physically involved in the alleged use of excessive force against Decedent. Rather, Plaintiffs' allegations make it clear that they were bystanders who merely witnessed the incident "from a distance of several yards." Nor is there any evidence or allegation that Plaintiffs suffered any physical injury as a result of the incident. Moreover, Plaintiffs have filed suit as next of kin of the Decedent and as Co-Special Administrators of the Estate of the Decedent, and not on their own behalf. As such, Plaintiffs lack standing in this lawsuit, as filed, to assert a claim for intentional infliction of emotional distress on their own behalf.

Here, Plaintiffs argue that summary judgment is not appropriate because Defendants Wildcat and Denny knew their conduct would lead to Decedent's death, and that such recklessness constitutes the intentional infliction of emotional distress. This Court finds that Defendants' conduct was not excessive or unreasonable. This finding undermines the basis of Plaintiffs' claim. Accordingly, Defendants Wildcat and Denny are entitled to judgment as a matter of law on Plaintiffs' intentional infliction of emotional distress claim.

### 3. Plaintiffs' Wrongful Death and Loss of Consortium Claims

Plaintiffs assert an additional state law claim for wrongful death against Defendants Wildcat and Denny. Plaintiff, Holly Lynch, as Decedent's wife, also asserts a loss of consortium claim. As stated above, Defendants are immune from such a claim. Even if they were not immune, they are entitled to summary judgment as neither claim may be maintained as a matter of law because Plaintiffs have failed to prove an underlying violation.

Oklahoma's wrongful death statute, 12 O.S. § 1053, reads in relevant part:

A. When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, or his or her personal representative if he or she is also deceased, if the former might have maintained an action, had he or she lived, against the latter, or his or her representative, for an injury for the same act or omission. The action must be commenced within two (2) years.

Oklahoma's wrongful death statute "does not expand the scope of claims or the number of persons entitled to bring an action, but merely entitles someone to bring what the decedent could have brought himself." *Econ. Fire & Cas. Co. v. Faulkner*, 790 F. Supp. 1082, 1085 (W.D. Okla. 1991) *aff'd*, 951 F.2d 1258 (10th Cir. 1991). "Before there is liability under the wrongful death statute, the deceased must have had a right of recovery for the injury at the time of his death." *White v. Equity Fire & Cas. Co.*, 823 P.2d 953, 954 (OK CIV APP 1991) (citing *Haws v. Luethje,* 503 P.2d 871, 874–75 (Okla.1972)).

Thus, whether Plaintiffs have a viable claim depends on Plaintiffs having an otherwise viable underlying state law claim. Plaintiffs have failed to establish any state law basis to recover from Defendants Wildcat and Denny. Therefore, Defendants are entitled to summary judgment in regard to Plaintiffs' claims under the wrongful death statute. Likewise, Holly Lynch's claim for loss of consortium is not an independent legal claim. This claim is statutorily defined and entirely derivative of Decedent's right to recovery at the time of his death. *See* 12 O.S. § 1053(B); *Little v. State Farm Fire and Cas. Co.*, 1993 OK 102, 857 P.2d 65. Therefore, Defendants Wildcat and Denny are entitled to summary judgment in regard to Holly Lynch's loss of consortium because there is no independent legal basis under which she can recover. Defendants' Motions for Summary Judgment are granted as to these claims.

### C. Plaintiffs' State Law Excessive Force Claim

Oklahoma uses the same "objective reasonableness" standard of care for the state law tort of excessive force as is used for federal excessive force claims. *See Morales v. City of Oklahoma City*, 2010 OK 9, 230 P.3d 869, 878-881. However, in addition to the three specific factors identified in *Graham*, *Morales* identifies four additional specific factors which must be considered as part of the totality of the circumstances: "(4) the known character of the arrestee; (5) the existence of alternative methods of accomplishing the arrest; (6) the physical size, strength and weaponry of the officers compared to those of the suspect; and (7) the exigency of the moment." *Id.* at 880.

In consideration of all these factors, Defendants Wildcat and Denny's actions were still objectively reasonable for the same reasons set forth *supra*. In summary, the situation was rapidly evolving, Decedent was actively resisting and unrestrained, and Defendants Wildcat and Denny took the necessary measures to defuse the situation. There is no evidence that

demonstrates Defendants should have known about any health risk factors of the Decedent. Instead, as Plaintiffs' witness states, it was an unforeseeable perfect storm that ultimately led to Decedent's death. There is no dispute that Defendants acted reasonably under the circumstances. Their Motions for Summary Judgment are granted on Plaintiffs' state law excessive force claims.

### D. Plaintiffs' *Bosh* Claim

In addition to their other state law claims, Plaintiffs also claim they are entitled to bring their claim directly under the Oklahoma Constitution. Plaintiffs, however, may not maintain a private right of action for excessive force under the Oklahoma Constitution. In *Bosh v. Cherokee Cnty. Bldg. Auth.*, 2013 OK 9, 305 P.3d 994, 1001, the Supreme Court of Oklahoma recognized a limited private right of action arising under OKLA. CONST. Art. 2, § 30 for claims of excessive force against pre-trial detainees. In *Perry v. City of Norman*, 2014 OK 119, 341 P.3d 689, however, the Supreme Court of Oklahoma found that *Bosh* does not provide a private right of action where a cause of action under the OGTCA is available. In *Perry*, the plaintiff claimed that police officers used excessive against him during an arrest. The plaintiff asserted a *Bosh* claim alleging a violation of his rights under OKLA. CONST. Art. 2, § 30. The Supreme Court of Oklahoma noted that the inmate plaintiff in *Bosh* was completely barred from bringing suit under the OGTCA because it provided complete tort immunity for claims arising out of the operation of prison facilities. The court found that, unlike the situation in *Bosh*, employer liability for a police officer's use of excessive force during an arrest was well-settled under the OGTCA and held that: "There is no rationale requiring the extension of a *Bosh* excessive force action brought under OKLA. CONST. Art. 2, § 30 to his cause." *Id*. at 693.

The same rationale applies to Plaintiffs' Oklahoma constitutional claim. As *Perry* makes clear, liability for claims of police officers' excessive force (outside of a detention facility) is

well-settled under the OGTCA. Excessive force claims against police officers are not completely barred under the OGTCA. The rationale underlying *Bosh*, thus, does not apply and Plaintiffs do not have a private right of action for excessive force under OKLA. CONST. Art. 2, § 30. Defendants Wildcat and Denny are further entitled to summary judgment with regard to Plaintiffs' Oklahoma constitutional excessive force claim because the *Bosh* opinion only held that Oklahoma governmental entities can be held liable for the use of excessive force by their employees in violation of the Oklahoma Constitution under a theory of *respondeat superior*. *Bosh*, 305 P.3d at 994. There are no grounds for expanding upon the *Bosh* decision where the Supreme Court of Oklahoma has not expressed support for such an expansive reading. *See Koch v. Juber*, CIV-13-0750-HE, 2014 WL 2171753, at *3 (W.D. Okla. May 23, 2014) (refusing to expand *Bosh* to provide a private right of action against individual employees under the Oklahoma Constitution).

Accordingly, Defendants Wildcat and Denny are entitled to summary judgment with regard to Plaintiffs' claim for excessive force under OKLA. CONST. Art. 2, § 30.

### E. Defendants' Qualified Immunity Claim

Defendants Wildcat and Denny are entitled to qualified immunity. At the outset, Plaintiffs are burdened with proving the constitutional right they claim Defendants violated was clearly established. Once Defendants asserted the defense of qualified immunity, Plaintiffs assumed the mandatory burden of establishing that (1) Defendants violated a constitutional or statutory right, and (2) that this right was clearly established at the time of their conduct. *Dodds, v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010); *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010); *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for

summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) (quoting *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008)).

In civil rights actions seeking damages from governmental officials, "courts recognize the affirmative defense of qualified immunity, which protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Gross v. Pirtle,* 245 F.3d 1151, 1155 (10th Cir. 2001) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). Qualified immunity protects public officials from individual liability in Section 1983 claims and is "an entitlement to not stand trial or face the other burdens of litigation." *Saucier v. Katz,* 533 U.S. 194, 200 (2001) *quoting Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). Qualified immunity is more than a defense to liability: it is immunity from suit that is effectively lost if a case is erroneously permitted to go to trial. *Schwartz v. Booker,* 702 F.3d 573, 579 (10th Cir. 2012). An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "clearly established." *Plumhoff, v. Rickard*, 134 S. Ct. 2012, 2022-2023 (2014). A Defendant cannot be said to have violated a clearly established right unless the right was sufficiently definite that any reasonable officer in the defendant's shoes would have understood that he was violating it. *Id.* "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate" and "[the Supreme Court] has repeatedly told courts…not to define clearly established law at a high level of generality since doing so avoid the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir.2005).

Moreover, it has long been the law that once a defendant asserts a qualified immunity defense in a dispositive motion, the responsibility shifts to the plaintiff to "meet a 'heavy two-part burden.'" *Case v. W. Las Vegas Indep. Sch. Dist.,* 473 F.3d 1323 (10th Cir. 2007). "[T]o avoid judgment for the defendant based on qualified immunity, <u>the plaintiff must show</u> that the defendant's actions violated a specific statutory or constitutional right, and that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Toevs v. Reid*, 646 F. 3d 752, 755 (10th Cir. 2011) (emphasis added). District Courts "may address these questions in whatever order is appropriate under the circumstances." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). Police officers are protected in "close cases" by the doctrine of qualified immunity, as such immunity serves to protect law enforcement officers from the chilling threat of liability. *Swain v. Spinney*, 117 F.3d 1, 10 (1st Cir. 1997). The conduct of the officer "must" be that of an official who is "plainly incompetent." *Stanton v. Sims,* 134 S.Ct. 3 at 5 (2013). Generally, there must be a Supreme Court or Tenth Circuit decision on point, or a clearly established weight of authority from other courts for the law to be clearly established. *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992).

Here, Plaintiffs define the constitutional right at issue as the officers' use of excessive force. Regardless, if Plaintiffs believe their definition of excessive force (which must also be considered in combination with all other circumstances of the incident) defeats Defendants' claim of qualified immunity, Plaintiffs - not Defendants - must meet the burden of showing clearly established law. The qualified immunity doctrine was expansively formulated to give "'government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Carroll v. Carman*, 135

S. Ct. 348, 350 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Thus, even if an officer's conduct has violated the Fourth Amendment, she is entitled to qualified immunity unless the officer violated a "clearly established" right. *Plumhoff*, 134 S. Ct. 2022-2023. It is Plaintiffs' burden "to show that the contours of the right were clearly established" at the time of the alleged misconduct. *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011).

The Supreme Court "ha[s] repeatedly told courts not to define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. 305, 308 (2015) (quotations and punctuation omitted). *See also Sheehan*, 135 S. Ct. at 1775-76 (reasoning that qualified immunity "is no immunity at all if "clearly established" law can simply be defined as the right to be free from unreasonable searches and seizures"). According to the Court, "[t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quotations omitted). Additionally, "[s]uch specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (quotations and punctuation omitted); see also *Johnson v. Peay,* 704 Fed.Appx. 738, 741 (10th Cir. 2017) *citing White v. Pauly,* 137 S.Ct. 548, 552 (2017) (If the circumstances facing the officer are not similar to any precedent, it is unlikely the officer's conduct violated 'clearly established' law.). In a similar vein, the *Mullenix* Court also held that courts should reject the invitation to pick among tactical alternatives in determining the reasonableness of a use of force. *Id.* (rejecting suggestion that officer should

have waited to see if tire-deflation device worked before shooting at engine block of fleeing vehicle). *See also Sheehan*, 135 S. Ct. at 1777 (noting that "even if an officer acts contrary to the officer's training, "that does not itself negate qualified immunity where it would otherwise be warranted").

In the instant case, there is a video recording of a significant part of the incident. While a court considering a summary judgment motion based upon qualified immunity "usually" must "adopt[ ] . . . the plaintiff's version of the facts," that is not true to the extent that there is clear contrary video evidence of the incident at issue. *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (quoting *Scott v. Harris,* 550 U.S. 372, 378–80 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment")). *See also Thomson v. Salt Lake Cnty.,* 584 F.3d 1304, 1312 (10th Cir. 2009).

In the present case, Plaintiffs cannot demonstrate that Defendants Wildcat and Denny violated Decedent's constitutional rights. In fact, the video reveals that at all times during the incident, Denny used an appropriate amount of force to detain the combative Decedent. While, the legal principle that citizens are to be free from the use of excessive force by government officials is indeed well established, the qualified immunity analysis in this regard is analyzed "in a more particularized, and hence more relevant, sense." *Anderson*, 483 U.S. at 640. Specifically, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id. See also Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The question is not whether Decedent had such a right, but whether it was clearly established that Defendants Wildcat and Denny's alleged actions violated

those rights. *Id.* As of April 4, 2015, Defendants' actions to restrain Decedent, who was being combative were not so clearly established that they would have known they violated Decedent's rights. Accordingly, both officers are entitled to qualified immunity.

### H.  Plaintiffs' Punitive Damages Claim

Finally, Plaintiffs have asserted a punitive damages claim against Defendants. There is no evidence that Defendants deliberately intended to cause Plaintiffs any harm. "In §1983 matters, punitive damages will be awarded only when 'the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1214, fn. 7 (10th Cir. 2006) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). *See also, Wulf v. City of Wichita*, 883 F.2d 842, 867 (10th Cir. 1989) ("an award of punitive damages requires an assessment of [defendant's] subjective state of mind"). The evidence, even viewed in the light most favorable to Plaintiffs, does not support a reasonable inference that Wildcat or Denny's conduct rose to that level in this case. *See e.g., Wulf,* 883 F.2d at 867 ("[N]ot every intentional violation of a plaintiff's constitutional rights subjects a defendant to punitive damages."). Not a single witness has testified that the officers exhibited any malevolence or other sufficiently culpable wrongful intent, nor is there any evidence of such intent. In fact, the evidence confirms that Defendants Wildcat and Denny's used only the amount of force necessary to restrain Decedent to effect the lawful arrest.

### CONCLUSION

Accordingly, the Motion for Summary Judgment of the Defendants Jerome Wildcat and Jack Denny is hereby GRANTED.

**IT IS SO ORDERED this 21st day of March, 2018**.

James H. Payne
United States District Judge
Eastern District of Oklahoma